In re FREEL.

(Supreme Court, Special Term, Kings County.  February, 1895.)

1. CONTRACTS—PERFORMANCE—LIABILITY OF CONTRACTOR.
Under a contract to furnish labor and material for the construction of a public work, which provided that the contractor should, as to the quality of material furnished and the manner in which the work was done, be subject to the directions of the engineer in charge, and that he should be paid monthly for the materials furnished and work done, such contractor is not responsible for defects in the work as a whole, if the directions of the engineer were complied with.

2. MANDAMUS—INFORMATION AND BELIEF.
In mandamus, deuials and affirmations, to be of avail, must be specific and positive, and not merely general conclusions based on information and belief.

3. MUNICIPAL CORPORATIONS—OFFICERS—CHARTER OF CITY OF BROOKLYN.
Under the provisions of the charter of the city of Brooklyn, all claims against the city must be audited and approved by the mayor and comptroller as well as the auditor.

Application by James Freel for peremptory writ of mandamus to compel the comptroller of the city of Brooklyn to draw a warrant in payment for work done and material furnished under contract.  Granted.

Tracy, Boardman & Platt, for petitioner.
Albert G. McDonald, Corp. Counsel, for defendant.

GAYNOR, J.  This is an application for a writ of mandamus to compel the comptroller of the city of Brooklyn to issue and sign a warrant upon the treasurer of the city in payment of a claim of the petitioner against the city for work done under a contract with the city.  The contract was for the laying of water pipes and the constructing of a reservoir.  It was made in the name of the city, by the mayor and the commissioner of city works, they being the officials authorized to make it.  The work itself was, by the city charter, done under the authority and control of the said commissioner.  Laws 1888, c. 583, tit. 15, § 11.  The contract required that the chief engineer of the department should, once every month during the progress of the work, make an estimate in writing of the work done and material delivered, and the value thereof according to the prices by units of measure established by the contract; and that the city should thereupon pay the contractor 80 per cent. of such estimate; and that "whenever, in the opinion of the engineer, the party of the second part [contractor] shall have completely performed this contract on his part, the said engineer shall so certify in writing to the commissioner of city works, and, in his certificate, shall state, from actual measurements, the whole amount of work done by the said party of the second part, and also the value of such work, under and according to the terms of this contract"; and that, upon the expiration of 30 days after the acceptance by the commissioner "of the work herein agreed to be done," the city should pay the contractor the amount then due and unpaid for work and material,

to be arrived at by deducting all previous payments upon the monthly estimates, and also 8 per cent. of the total contract price, which, by the terms of the contract, was to be retained to remedy any defects which might develop in the work during six months thereafter, unless the contractor remedied them upon notice. It will be observed that monthly payments were to be made upon estimates of the engineer, while the final payment was to be arrived at by actual measurements. The engineer made 30 of such monthly estimates as the work went on, which were paid. Each went the regular course prescribed by the city charter, namely: It was certified by the engineer to the commissioner of city works, who also certified it; it was then audited by the auditor, whereupon the comptroller drew a warrant for the amount upon the treasurer, and signed it, which was then signed by the mayor and city clerk, and sent to the treasurer, who paid it. The thirty-first monthly estimate was so made, certified, and audited, but the comptroller refused to draw and sign the warrant for the amount thereof. Each monthly estimate was styled such upon its face, in these very words. Finally, the engineer made out and certified what is styled on its face the "Final Monthly Estimate." It is not an estimate, but an adjustment of the whole account upon actual measurements, the work having been completed. It shows the total amount of work and material, and the total price therefor according to the prices by units of measure fixed by the contract. It deducts all previous payments, and also 8 per cent. of such total price, as the contract requires shall be done by the final certificate, as has already been seen. It does not say in so many words that the contract has been completely performed, but it gives the total, and makes the deductions, and shows the final balance, all as the contract requires of the final certificate; the 8 per cent. being deducted and kept, as aforesaid, against the development of any defects in the work during the next six months, whereas 20 per cent. had theretofore been retained out of the monthly estimates. This certificate must be deemed the final one required by the contract, as certifying the completion of the contract,—that is to say, of all items of work to be done under the contract,—after which was to come the six-months test of the work as a whole. It is styled an "estimate," but it was not an estimate, nor is it claimed that it was, the claim being that it does not amount to an acceptance of the work as a whole, which is correct; for the work, as a whole, by the terms of the contract, was not to be finally accepted until six months thereafter, the 8 per cent. being held meanwhile. By the words of the contract, the commissioner's acceptance was only of "the work herein agreed to be done." This final certificate was approved by the commissioner on November 1, 1893, and audited by the auditor, like all its predecessors, but the comptroller has not made and signed a warrant therefor. He refused to do so in the case of this and the preceding one, though they were duly certified by the engineer and the commissioner (who are made by the contract the judges of the work and of the execution of the contract), and audited by the auditor.

The refusal seems to have been based on nothing except an informality which the legislature has since cured. Chapter 595, Laws 1894.

A few days after this case was argued the court of appeals of this state rendered a decision that, in such a case as this, ministerial officers of a city, whose duty it is to pay, or to raise money to pay, claims thus arising under contract, and certified and allowed by the officials intrusted by law with that duty, may not refuse to do so upon the allegation or claim by them that the work was not done, or even that the certificate of it was false, or given under a mistake of facts; that it is for the city itself to make such an issue; and that such ministerial officers cannot make it for the city. People v. City of Syracuse, 144 N. Y. 63, 38 N. E. 1006. It is for me to yield implicit obedience to this far-reaching decision, and I do so; but it does not control this case, unless the duties of the comptroller of the city of Brooklyn in respect of claims presented against the city are only clerical or ministerial, and this I do not concede. The charter of the city prescribes a succession of safeguards to the city treasury. In the first place, no bill or claim can be audited unless it be made out in items, and certified by the officer or head of department by or under whom it is incurred. Laws 1888, c. 583, tit. 5, § 13. In that form it goes to the auditor, an official whose duties are judicial in their nature, and of the highest importance. He has to examine and pass upon the claim in all its aspects, both of fact and of law. It cannot be paid until he certifies that the work has been done and the materials furnished, and that the charges are just, or according to contract, if there be one, and lawfully incurred. Section 1. To satisfy himself of this, he has the right, and it is his duty, when necessary or prudent, to take evidence and inspect books and papers. If he fail in this, it is either because he does not understand the nature of the duties of his office, deeming them merely perfunctory, and, it may be, to be turned over to a deputy or clerk, or else because he refuses to fulfill his trust. The charter allows him to appoint a deputy to act "during his absence," which means an occasional temporary absence from his office, from sickness or the like. Title 22, § 26. It does not mean that the auditor may, in general, turn his office and judicial duties over to a deputy. Throop, Pub. Off. § 586; People v. Hopkins, 55 N. Y. 74. A bill or claim, after being thus examined and allowed by the auditor, becomes a voucher, which must be "also approved by the comptroller" (title 5, § 2) before he may draw and sign a warrant on the treasurer therefor; and, finally, such comptroller's warrant has also to be signed by the mayor, but the mayor is expressly prohibited from signing it "unless a proper voucher therefor shall have been first examined and certified to by him" (title 3, § 11).

Thus are these three officials placed by law at the gateway to the public treasury of the city of Brooklyn. I have been at pains to show that auditing duties are given to and required of the comptroller and mayor, as well as the auditor (not in so scrut-

inizing and minute a degree, it may be, but still actually), in order to make plain that the case which I have cited does not govern the case now in hand. If either the mayor or comptroller doubt the correctness of a voucher, he has the power, and it is his duty, to examine into the claim; if, for instance, the voucher, in a given case, should show 1,000 feet of common lumber at, say, $2,000 or $10,000, or the like, or should not be itemized, or should be for an expenditure the city has no power to make, he would be inexcusable if he should sign it, because his duties are not perfunctory, but, on the contrary, they cast upon him the obligation of judgment and discretion.

It being, therefore, the duty of the comptroller to examine and approve all vouchers coming to him from the auditor, and that being a duty of substance, as well as of form, as we have seen, it only remains to inquire whether, upon the facts before me, he is justified in his refusal in this instance. That inquiry is met at the threshold by difficulties growing out of the contract itself, which, instead of binding the contractor to definite specifications, leaves the most essential particulars in respect of work and material to the discretion of the engineer, to be fixed or changed by him as the work goes on. Indeed, the contract, in this respect, may be called extraordinary. It might well be supposed that the best material for the sides or the bottom of a reservoir—for instance, the materials, and the proportion in which they should be mixed, to make puddle which will hold water in a reservoir—are well known; and yet by this contract the contractor is not bound by specifications in these essential particulars, they being left to the direction of the engineer. And therefore, if this reservoir leaks, the question obviously is whether the blame lies with the engineer, and not with the contractor. If the contractor followed the direction of the engineer, as he was bound to do, his obligation was fulfilled, whatever the result.

The petition makes out a full case for a peremptory writ. It states the contract; the performance of the work as directed by the engineer; the certification thereof, and of the amounts due by the engineer and by the commissioner; and the audit of the amounts due by the auditor. The petitioner thus presents a complete case, not depending upon his word alone, but upon the official action of the officials to whom the contract subjected him. It is met first by the affidavit of the comptroller, which is expressly made upon information alleged to be "received from the department of city works," except the general and unspecific statement that "the reservoir is defective and incomplete, and not according to said agreement." I am therefore required by law to disregard it, for it is a rule that denials upon information and belief, in a proceeding for a mandamus, and affirmations which are not specific and positive, or are only of conclusions, are of no avail. Merrill, Mand. § 274; Spell. Extr. Relief, § 1664; People v. Common Council of City of Brooklyn, 77 N. Y. 503. Moreover, the court has before it the affidavits of the engineer and commissioner of the department of city works, which makes of no

consequence the comptroller's allegations of information from them. Next is the affidavit of the former deputy auditor, who audited the claims. It impeaches the claims in no way, and shows nothing except that the auditor did not audit them, but that the deputy did; a fact well deserving of notice elsewhere, though of no potency here, the validity of the audit not being questioned. Next is the affidavit of the former chief engineer, which alleges, in the most general terms, that the contractor "has not yet complied with all the terms and conditions" of the contract, and that the work has not yet been accepted by the city. As we have seen, such indefinite allegations are worthless. They are mere statements of conclusions. But, of course, the contractor has not yet complied with "all the terms and conditions" of the contract. No one claims that he has. He has yet to remedy any defects discovered by the use of the reservoir, as a guaranty of which the 8 per cent. is withheld. It also says that the two unpaid certificates were only intended as a statement of the work done and material furnished. Certainly; no one claims more concerning them; and that the final one was not an acceptance of the work does not need to be vouched for by affidavit, for such is the contract as we have seen,—the work to remain thereafter on test for six months. It further avers that thereafter the reservoir was tested, and is now being tested, by having water stand in it, but no defect whatever is specified. But this all has to do with the 8 per cent. reserved under the contract to remedy any defects which should be shown by test or use of the reservoir after the work and material had all been certified and paid for. If there were any known defects, the engineer is the one who could specify them to the court. And if the reservoir leaks, which the engineer does not say, it would be for the engineer to show how the contractor is responsible for it; for, as I have pointed out, he was obliged to use the puddling and other material specified by the engineer, and as directed by the engineer. Next is the affidavit of the former commissioner. It does not impeach the certified work and material, nor the work as a whole, either generally or in any particular; and it points out that 8 per cent. was reserved, under the terms of the contract, as a guaranty that any defects developed upon test would be remedied. Next comes the affidavit of the present commissioner, in which he says that since February 1, 1894, he has examined the work, and "that the petitioner has not fully complied with all the terms and conditions contained in the said agreement, to be kept and performed by him, and he has not fully performed the said agreement on his part, and he has not completed the work to be done by him under the said agreement, and such work so to be performed by him has not been accepted." But, again, such unspecific statements are worthless. They are not statements of facts, but of conclusions, whereas the court is to draw the conclusions, and may do so only upon specific statements of fact. That the work was not accepted by the final certification of work and material does not need to be sworn to, for such is the contract. The test was to come later, and

8 per cent. was reserved to meet it. That test was begun, and is still going on, without a result, according to the engineer's affidavit, as we have seen. The affidavit then states information received from the said engineer. But, again, that cannot count; and, besides, the affidavit of the engineer is before the court. The affiant then states that after he became commissioner the petitioner worked upon the reservoir to remedy defects, which are not specified, and that in September, 1894, he informed the commissioner that he thought they were corrected, and that, to ascertain whether that was the fact, the affiant began a new test, which he says "is still being continued as rapidly as practicable, with unsatisfactory results thus far, as the water let into and stored in the reservoir for such test has still continued to leak out to an improper extent, and to such an extent as would not have occurred had the work, under the said contract, including that stated in the thirty-first and thirty-second estimates, been properly done." It would be difficult to be more indefinite than this. How or where the reservoir leaks, or of the specific cause thereof, the court is not informed. The commissioner says it leaks to an improper extent. Whether this covers a gallon or 10,000 gallons a day is not stated. It is a mere conclusion, supported by no stated fact. And, if the puddling leaks, is it the fault of the engineer, who specified its ingredients and their proportion, or is it that of the contractor, who had to obey him? And let it again be stated that the 8 per cent. is reserved as a guaranty that the contractor will remedy defects, and the commissioner's affidavit shows his willingness to do so. The work and material actually done and furnished are required by the contract to be certified and paid for monthly. For defects which should develop after the completion of the work as a whole, the contract makes separate and independent provision, as we have seen. The affidavit then continues:

"It has not yet been practicable to ascertain the full extent of the defects in the reservoir, which can only be revealed after such a test of the sides of the reservoir as has not yet been practicable."

It cannot be expected that from this statement the court is to presume there are defects which the commissioner has not yet been able to find. And why has "such a test" as the commissioner seems to have in mind not yet been practicable? The six months allowed by the contract have elapsed, and the 8 per cent. is still retained. When is the test to be practicable which is to discover defects which should have been discovered in six months, but are not yet discovered, and may not exist at all? The affidavit then states that "the defects disclosed, and likely to be disclosed, in said reservoir, are likely to require" more expenditure than the amount reserved by the contract. This court is not informed what this succession of likelihoods is based upon. The defects disclosed are not described, and those likely to be disclosed are not even hinted at. The affiant then states that, upon investigation since he came into office, he has ascertained that the clay used for puddle was the property of the city, "having been taken by petitioner from the property of the city at Smith's pond, a little over a

mile from the reservoir, and without agreement or consent of the city"; and then follows an argument that the city has a valid claim therefor. The commissioner does not state how he ascertained this, nor any fact which enables him to allege it, but the affidavit of L. R. Clapp is produced to substantiate it. He is an assistant engineer in the department of city works, and his affidavit avers that he remembers the contract of the petitioner with the city "for digging out and enlarging Smith's pond"; that he had the supervision of the work; that he is also "familiar with the contract" to construct the reservoir, which is the subject of the present controversy; and he then adds:

"None of the clay dug and taken by said Edward Freel from the property of the city at Smith's pond. and which was by him used as clay for puddle in the construction by him of the said reservoir, was either dug or taken under any of the provisions of the said contract or plans, or orders of the engineer, nor was it necessary to dig the same in order to perform the said contract for digging and enlarging Smith's pond."

Here is a general statement that none of the clay in question was taken from Smith's pond under the reservoir contract. I do not see the use of this statement. If the earth was taken, the terms of the reservoir contract determine whether it was taken under it. And the concluding statement, "nor was it necessary to dig the same in order to perform the said contract for digging and enlarging Smith's pond," is worthless, it being a mere conclusion of the affiant. He does not say that it was not dug out of Smith's pond in carrying out the contract for enlarging Smith's pond, but that it was not necessary to dig it out in performing such contract. The real truth is obviously veiled by this affidavit. No doubt, the clay was dug out of Smith's pond, and the court is not permitted to take this affiant's conclusion that it was unnecessarily dug out. And, if it was unnecessarily dug out, it is not seen how that would make any difference, and no fact is stated from which the court may draw the conclusion that it does make a difference. The earth excavated at Smith's pond would presumably belong to the contractor, and it would be his duty to get it out of the way. Cooper v. Kane, 19 Wend. 386. The contract now before the court expressly contains such a requirement. But the answer to this claim against the petitioner, left wholly unsubstantiated by any facts from which the court may draw a conclusion, is that it does not enter into the question of the performance of his reservoir contract; it pertains to his Smith's pond contract; and, if the city actually has any such claim for the larceny or conversion of its property, it is for it to bring action upon it, so that the case may be tried. It cannot be mixed up with the audit of the contractor's claims under the reservoir contract, for the auditing officers have no power to pass upon it. They can only audit claims against the city, not claims by it.

Finally, the affidavit of the commissioner asserts a liquidated claim against the contractor for $250 a day for not completing the work within the time prescribed by the contract. The contract requires the contractor to begin the work on a written notice from

the engineer, and to complete it within $2\frac{1}{2}$ years thereafter, and provides that if he fail to complete the work within that time, "or within such further time as may be allowed by the commis- sioner of city works," he shall pay to the city $250 a day for each day he shall be in default, "as the liquidated damages which the party of the first part will suffer by reason of such default, and not by way of penalty." And, after providing that such liquidated damages might be deducted from moneys that should come due under the contract, the clause ends as follows: "Provided, how- ever, that said commissioner of city works shall have the right to extend the time for the completion of said work if he should decide so to do." The commissioner, in his affidavit, says, on informa- tion and belief, that such written notice was given to the con- tractor on January 3, 1890. Here, again, is a statement on in- formation and belief, which must be disregarded. The last monthly estimate includes work and material done and furnished up to August 21, 1893. The final certificate is not of further work, but is only an adjustment of the whole account upon actual meas- urements, and was approved by the commissioner of city works on November 1, 1893, which was before the present commissioner came into office. The question of exacting the $250 a day was left by the contract wholly to the commissioner, he being empowered to prolong the contract time at pleasure. From the undisputed facts, and especially from the final certificate, it appears that the commissioner under whom the work was done did not claim any damage for delay, but, on the contrary, accepted the work and material, and certified it for audit in full. This, in view of the power and discretion vested in him concerning time of perform- ance, is conclusive. I have not omitted to notice the provision of the contract upon which stress is laid,—that no certificate of the engineer shall bind the city, or any department or officer; but, at the same time, I have noted that it does not say certificates of the commissioner shall not be binding, and while the auditor, comptroller, and mayor have powers of audit, they have not the power to abrogate the lawful acts of the commissioner. But, at all events, the affidavit of the present commissioner fails to make out a claim on this head, and the able brief of the learned counsel for the city seems to concede this by failing to press such a claim. The commissioner's affidavit states that on March 12, 1894, he served a notice upon the contractor that the city would hold him liable for all its rights under the contract, and he specifically claims the liquidated damages from that date. But this is based upon a misconception of the contract. No such damages could accrue after that date. The reservoir was then, by the terms of the contract, and had been from the date of the final certificate, as we have seen, and as is alleged by both sides, undergoing the period of test provided by the contract for the development of defects for which the 8 per cent. is held.

In conclusion, the contract is not for a gross sum, but provides that the actual work done and material furnished each month shall be paid for according to the prices fixed for the units of measure

specified herein. It subjects the contractor to the direction and control of the engineer in every particular concerning which there is any question suggested in this case, and also generally; and the affidavits on behalf of the city do not specify any particular in which the contractor failed in his contract. No particular work is said to be badly done, nor is any material said to be unfit or inferior. The finger of objection is put upon nothing. And when we come to the matter of the discovery or development of defects by test, for which the contract reserves six months in time after the last certificate for work and material, and 8 per cent. of the total contract price, as we have seen, it has to be said that although not only the six months, but more than a year, had elapsed from the date of the final certificate to the date of the submission of this case to the court, there is not a specific defect shown, and the affidavit of the commissioner goes to the extremity of saying that the reservoir is now being tested for defects "likely to be disclosed." Nor is it even suggested that the contractor has manifested any unwillingness, much less that he has refused, to supply any and all omissions and defects that have been or may be pointed out, but the contrary is shown by the respondent. It seems to me that, if there were any, the commissioner of city works and his engineers could readily discover and particularize them. General and indefinite statements will not do in law, any more than in any other relation. I have made a careful examination of this case, with a result which I had not expected, and which justice requires that I do not try to avoid.

The motion is granted, subject to the credits shown.